Carr, J.
it is well settled, that in considering the evidence, in cases of demurrers to evidence, the court will draw any inference against the demurrant, which could fairly be drawn by a jury. It does this of necessity, because it is put in the place of the jury; and it does it the more freely, because it is considered not favorable to justice, to encourage this withdrawal of the facts from the appropriate tribunal. The will of the testator Peyton, provides, that such of his slaves as were then 40 years old and upwards, should serve one year and no longer, and then be emancipated; and emancipates such of his slaves as were younger, prospectively, in classes, as they should attain to particular ages. Not long after the will was proved, in 1801, the executor, in open court, declared his assent to the liberation of four slaves, then entitled to their freedom under the will; and being asked by the court, said he considered the estate sufficient to pay the debts. It is also proved by other testimony, that the estate was fully sufficient, without the slaves, for the payment of all the testator’s debts; and that, at the time of the trial, there were, forming a part of his estate, 4000 acres of land in the western country, and 600 acres in Virginia. Notwithstanding these facts, an execution on a judgement obtained against the executor, was levied on the plaintiff, who was under the age prescribed by the will for his manumission, and had still some years to serve, when the execution was levied (how many we do not exactly know) and under this execution he was sold for 135 dollars ; the executor attending the sale, and rather encou *294 raging it than otherwise. The executor died subsequently, and before the plaintiff attained to the age appointed for his manumission. Upon these facts, there can be no doubt, that, in equity and justice, the plaintiff is entitled to his freedom. The only doubt is. whether being in a court of law, we can, without violating its forms and principles, mete out that justice to him. The point of doubt is, whether the jury might fairly have inferred, from the evidence, the executor’s assent to the emancipation ? I think it might. With respect to what shall constitute such assent, the law has prescribed no specific form : a very slight assent is held sufficient; and it may be either express or implied. Any expression or act done by an executor, which shews his concurrence or agreement to the thing bequeathed, will amount to an assent; and as an assent is but a perfecting act, the executor cannot, after he has once given it, revoke it. A house and land held by leave, is devised to A. for part of the term, and to B. for the residue; the assent to A.’s legacy, enures to B. also. 4 Bac. Abr. Legacies. L. p. 444-6. Toll. Law ex’ors, book 3. ch. 4. <§> 2. p. 307.* Plow. 521. 540. Wentw. Off. ex’ors 234. Now, according to these authorities, it seems to me, that, by proclaiming in court the sufficiency of the estate to pay all debts, and assenting to the freedom of the slaves then of the proper age, the executor has done that perfecting act, which shewed his concurrence with the bequest, and which enured equally to all the slaves : for, in point of right to freedom, they all stood on the same ground, and the bequest was but as one; and we know, that, if the estate had not been in a situation to free them all, as they came to the age designated, no court would permit the executor to manumit some and make slaves of others, but the burden of servitude would have been equally distributed. If it should be said, that the sale of the negro afterwards in the presence of the executor, shews that he had not assented; I answer, no; it could not shew that, for the former act must speak for itself. The most it could *295 shew, would be an intention in the executor to recaí the assent formerly given; which, as we have seen, he bad no right to do. But I do not think wo are forced to conclude that it shewed even this; for, it is to be observed, that the will was of record ; the declaration of the executor had been made in open court; and in addition to this, the negro was sold but for 135 dollars; not more than three years hire ; and he had probably a longer term than that to serve. Under these circumstances, may we not infer, that the price was regulated by the knowledge of these facts, and the consequent right of the plaintiff? I think, in common charity to the executor, this may be inferred. Placing the cause upon this ground, I am relieved from considering the other points raised, and argued with great ability, by the attorney general; and as they are grave and important, and new points, and only three judges are present, I choose, so far as I am concerned, to leave them open. I approve the judgement of the county court.
Cabell, J. concurred.
Tucker, P. This case has been very ably argued, upon various interesting points; but I am inclined to think it must turn at last upon the evidence set forth in the demurrer, and the general principles of law in relation to demurrers to evidence.
That a slave emancipated by will, cannot successfully assert his freedom by a proceeding in a court of law, without the previous assent of the executor to his emancipation, has certainly been the general impression of the profession in Virginia. I think it a correct one. The analogy is strong and apt, between emancipation and a specific legacy. Emancipation is a legacy of freedom to the slave, on the one hand, and, on the other, an abstraction of the value of the slave from that fund (the personalty) which, from the foundations of the common law, has been held sacred to the discharge of the debts of the testator. The anomalous cha *296 racier of this species of property, and the liberal and beneficent spirit in which the law of emancipation has been administered, has given rise, indeed, to some distinctions between the legacy of freedom and an ordinary specific legacy-. Thus, for instance, an emancipated slave is not required to give a refunding bond ; and, in case of deficiency of assets, though the specific legatees may be compelled to abate proportionally, emancipated slaves would only be compelled to abate as between themselves. In other words, all other specific legacies must be swept, before an emancipated slave can be subjected to the debts at all. Yet I think it cannot be questioned, that, in genera], a legacy of freedom has been looked upon by the courts as of the character of a specific legacy. If so, until the executor assent, it cannot be demanded by action at law, unless some act of the legislature, or some principle of convenience, shall establish a difference in favor of the suitor for freedom.
That a specific legatee shall not recover his legacy at law, without the assent of the executor, is a principle that grows out of the character of his trust, the nature of his interest in the personal estate, and the imperfection of common law proceedings. The executor is, especially, a trustee for the creditors of the decedent. The law casts the whole of the personalty upon him, at the instant of bis testator’s death, and injoins the payment of the debts of the estate as the first duty to be fulfilled, after discharging the sacred obligation of interring the deceased. In the performance of this duty, he is to disregard all the commands even of the testator’s will in conflict with it. He is not to lessen the fund for the payment of the creditors, by fulfilling his benevolences, or even supporting his bereaved family. Until the debts are paid, nothing is to be abstracted. The testator is required to be just before he is generous j and even the act of emancipation must yield to the demands of creditors.
To effect the objects of this trust, the law casts the property upon the executor. It considers him the absolute owner; and though after the discharge of all the debts, he *297 may be compelled by the proper tribunal to pay the legacies and make distribution, even this cannot be done until an investigation has been made of the affairs of the estate, and the state of the demands against it. And even then, though a balance may appear against him, the legatee or distributee must give a refunding bond, before he can insist upon payment. The necessity for this investigation, and the further necessity for adjusting the pretensions of legatees in case of abatement, and of the persons entitled to the residuum when distribution is to be made, conspire to render a court of common law an unfit tribunal for the legatee who sues without the previous assent of the executor; and hence the jurisdiction is now, without contradiction, admitted to be vested in courts of equity exclusively.
To the case of a slave who claims his freedom tinder the will of his master, all the reasons which confine the jurisdiction of suits for legacies before assent, apply with additional force. For (as we have all seen from the case of Patty v. Colin, 1 Hen. & Munf. 519. and the recent cases of Dunn v. Amey, 1 Leigh 465. and Paup v. Mingo, ante 163.) many formidable difficulties arise in these suits for freedom, peculiar to them, and insuperable unless by the aid of a court of equity. I am of opinion, therefore, that a slave cannot recover his freedom under a will, in a court of law, without proving the assent of the executor, if, as I shall attempt to shew, such assent is necessary.
It seems to have been supposed, however, in the argument, that by the statute concerning pauper suits, a slave may, if he pleases, assert his right to freedom in a court of law, and adopt the common law process, and yet be permitted to go into all those matters which belong peculiarly to a court of equity, and to have such redress as that court could afford him. This would certainly be very inconvenient, and is as certainly, I think, an incorrect interpretation of the statute. That a court of equity has jurisdiction, in proper cases, of suits for freedom, no longer admits of dispute, after the repeated decisions of this court, and the *298 cases in which the jurisdiction has been entertained. Dempsey v. Laurence, Gilm. 333. and Dunn v. Amey, and Patty v. Colin, just cited. Yet if we look to the act itself, though there would seem reason to doubt the jurisdiction of the superiour courts of chancery, there is none for supposing that the slave was to be confined to the courts of law alone. As I think the act has been much misunderstood, it may not be amiss to offer my idea of its construction.
Until this act was passed, the remedy of a person held in slavery for the recovery of his freedom, was unregulated. The writs of habeas corpus and de homine replegiando were, among others, resorted to.. They were vexatious in their character; and the latter has been accordingly repealed, while the provisions in relation to the former rendered it an objectionable and improper remedy for the trial of the right of a slave to his freedom. Therefore, by the act of 1795, ch. 11. a plain and easy remedy was provided. The preamble distinctly evinces, that it was suggested, less by an anxiety to facilitate the remedies of the slave, than by “the great and alarming mischiefs, which had arisen in other states of the Union, and were likely to arise in this, by voluntary associations of individuals” (commonly known under the appellation of emancipation societies) “ who had, in many instances, been the means of depriving masters of their property in slaves, and in others occasioned them heavy expenses in tedious and unfounded law suits.” Accordingly, its scheme seems to have been to require in the incipient stages of the proceeding, some evidence of’the probability of bis right, before he s’hould be either removed from his master’s possession, or entitled to call upon him to answer his complaint. Therefore, it provided, that the complaint should either be made to a magistrate out of court, or to the district (now circuit) or county or corporation court, and, not elsewhere ; a negative provision inserted for the master’s benefit, not for that of the slave. Upon offering his petition to the court, he is required to set forth the material facts of his case, supported by affidavit or otherwise; whereupon *299 counsel are appointed, who are required to make an exact statement of the case, with their opinion thereupon; and the court, accordingly, makes an order allowing or refusing the prayer of the petitioner to bring suit. The form in which this suit is to be brought, is not prescribed. But the statute having authorized the application to two courts, one of which had complete equitable jurisdiction, there is nothing from which we are necessarily to infer, that the legislature intended to obliterate the distinctions of jurisdiction, in the case of suits for freedom, more than in other cases. When the slave applied to counsel to draw and present his petition, that counsel, according to the nature of the case, should prefer the petition to the court of law, or to that court which combines in itself the powers both of law and chancery. If the claim should admit of being prosecuted in a court of law, it might be presented either to the county or circuit court. If equity alone could administer relief, it ought to be presented to the county court, where it might be tried on the chancery side j and though it may be admitted there can be no mere equitable right to freedom, yet it has also been admitted that cases may occur where the suitor may need the aid of a court of equity.
Such I have no doubt was the scheme of the act, and accordingly I can see no reason for supposing, that a suit for freedom may be tried in a court of law upon equitable principles and equitable modes of proceeding. Nor does the idea receive countenance, as was supposed, from the language of the statute concerning pauper suits, that the court “ shall appoint, in pauper suits, all proper officers Sic.” and so, may appoint auditors to settle the administration account. For this clause was not a part of the act of 1795, ch. 11. and therefore cannot bear upon it, even if the inferences drawn by the counsel were at all admissible. I am, therefore, of opinion, upon the whole matter, that if the necessity for the assent of the executor to the legacy of freedom, stands upon the footing of the assent to other specific legacies, that assent is necessary to be proved, in order *300 to entitle the slave to recover his freedom, by action in a . court oi law.
I have already endeavoured to shew, why it is that the assent of the executor to a specific legacy, is essential to its vesting as a legal right. The executor holding the estate upon the sacred trust of appropriating it first to the discharge of debts, will never be compelled to deliver it over, until by his assent it is admitted, or by a judicial proceeding it is established, that there is no longer a necessity to withhold it. The latter lays the ground of the jurisdiction of equity in the matter; the former is the only ground on which that of courts of law has ever rested. Now, the reason for the executor’s assent, is as strong in the case of a bequest of freedom as in any other. Whether, metaphysically, we can with propriety call it a legacy, it is not important to consider. Practically, it is a withdrawal from the personal fund, destined by law for payment of debts, of a part of that fund ; and there is the same necessity in this as in the case of other specific legacies, for establishing, either by the assent of the executor, or the settlement of his administration account before a proper and competent tribunal, that it is no longer necessary to retain the fund.
It was said, however, that the legislature has pointed out the only method in which emancipated slaves shall be subjected to the payment of the debts of their former owners: that they shall be “ liable to be taken by execution to satisfy the antecedent debts” of such owner : and it is contended, that the executor has nothing- to do with an emancipated slave; that he constitutes no part of the assets, and that he can only be reached by the direct execution of the creditor. These are novel doctrines, and though sustained with great ability, we must not rashly subscribe to them. It is not necessary, that I should at this time go into a full examination of them; as, owing to the absence of two of our brethren, the court cannot settle a'new principle, or overthrow those which have been long established. Whenever we are called upon, imperatively, to pronounce upon them, many grave *301 considerations will present themselves. We shall have to look to the possible effect of a change of the current of decisions upon slave rights, acquired by purchase from executors, even where their testator’s estates have been overwhelmed with debt; we shall have to explain in what manner the creditor is to proceed, to get an execution against a slave, or to get a judgement against the executor, when that executor has no assets in his hands according to this system of opinions; we shall have to decide, whether it could have been intended to permit a dispersion of the slaves of a testator emancipated by his will, to the prejudice of his creditors, or to require that although it should be altogether clear that the debts would sweep the whole, there should be no sale of them to pay the debts except under the hammer; a proceeding equally injurious to the estate, and inhuman towards the slaves. We shall also have to enquire, whether it really could have been the design of the legislature, in 1782, when the emancipation act was first passed, altogether to exonerate slaves emancipated by the will from the payment of the testator’s debts$ for the provision expressly making emancipated slaves subject to the debts of the owner, contained in the 54th section of the statute concerning slaves, was not enacted till 1792. If then, emancipation is not to be considered, under the 53rd section, as subordinate to the rights of the executor devolving upon him at the instant of the decedent’s death, under the general principles of the common law, which postpone all the benevolences of the testator to his just debts, then there were ten years during which a man might by will have defrauded his creditors of their demands, by an universal emancipation of his slaves. It may at least be doubted, whether such was ever considered to be the intention of the law. Upon much reflection, and upon an examination of the case of Woodley v. Abby, 5 Call 336. which arose on an emancipation prior to the statute of 1792, I incline to think, that the proviso contained in the 54lh section, was added to meet the case of emancipation by deed ; slaves emancipated by will being *302 considered, independently of that provision, as assets in the executor’s hands, until his assent was given to the bequest of freedom.
I am, then, clearly of opinion, that the assent of the executor must be shewn in this case, to sustain the demand of the plaintiff.
But, upon a careful examination of the testimony, I think the jury would have been justified in inferring that assent from the facts proved. The proof is not as full, indeed, as could be wished ; but it certainly establishes the right of the slave to recover his freedom by bill in equity; and I would not, therefore, require as rigorous proof as might otherwise be demanded. From the testimony in the cause, it might well and fairly have been argued, that the estate was amply sufficient to pay the debts, without charging the slaves; that the executor knew this ; that knowing it, he assented at once to the emancipation of four who had then attained the proper age : that this assent to the freedom of four of the slaves is perhaps an assent to that of the rest; that if Nicholas had, at that time, been of the proper age, he would have expressly assented to his freedom; that a design to enslave him tortiously forever, could not have been fairly inferred against a man, who had so promptly manifested a just design to carry the will into execution; that when he was taken by execution, he had still some time to serve; that he was a negro man in the prime.of life; and that having sold for the insignificant sum of 135 dollars, it was fair to presume he was not sold for life, but only for his remaining term of service. The testimony, that the executor stated the title to be good, except so far as it was questioned by a particular claimant, being the testimony of the demurrant, cannot weigh against these inferences : and the jury might have concluded, without doing violence to the evidence in the cause, that the residue of JVicAoZas’s term alone was sold, and that it was so understood at the time of the sale. If so, those facts would amount to an assent on the part of the executor, and establish his right to freedom, which could *303 not be divested by the levy of the creditor’s execution; Burnley v. Lambert, 1 Wash. 308.
Judgement of the circuit court reversed, and that of the county court affirmed.

 Gordon’s American edi. Philadelphia 1824.